**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **BRITNEY SCHMIDT,** | ) | |
| | ) | **Civil Action No.** |
| | ) | |
| **Plaintiff,** | ) | 3:26-cv-1301 (AMN/ML) |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **CORNELL UNIVERSITY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Britney Schmidt ("Plaintiff" or "Prof. Schmidt"), by and through her attorneys,

Nesenoff & Miltenberg, LLP, as and for her Complaint against Defendant Cornell University

("Defendant" or "the University" or "Cornell"), respectfully alleges as follows:

**THE PARTIES**

1.      Plaintiff is a female resident and domiciliary of New York.

2.      Defendant was and is a private Ivy League institution and federal land grant

doctoral university in Ithaca, New York.

3.      Upon information and belief, Cornell receives, and at all relevant times did receive,

federal financial assistance by virtue of, among other things, federal grants and contracts.

4.      Accordingly, Cornell is subject to liability under the Rehabilitation Act of 1973 (the

"Act").

1

5.      At all times relevant to this Complaint, Defendant was Prof. Schmidt's "employer" as that term is defined by all applicable New York State and federal laws.

6.      At all times relevant to this Complaint, Prof. Schmidt was an "employee" of Defendant as that term is defined by all applicable New York State and federal laws.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendant.

9.      Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims took place in Ithaca, New York which is in the Northern District of New York.

## FACTUAL ALLEGATIONS

### I.      Prof. Schmidt's Background and Start of Employment at Cornell

10.      Prof. Schmidt is a world-renowned earth & planetary scientist and astrobiologist with a particular focus on studying ice on Earth and other planets and how climate change is affecting the Earth's poles and ice shelves and contributing to sea level rise.

11.      Within her fields, Prof. Schmidt is considered the preeminent authority on her area of expertise including Europa's habitability, Earth and planetary ice-ocean interactions and under ice robotics and is revered by scientists world-wide.

12. As part of her research, Prof. Schmidt has conducted 14 polar field expeditions to locations including Greenland, Antarctica, and the High Arctic, working with US, British, Norwegian, New Zealand, Canadian and other agencies and collaborators.

13. In 2021, Plaintiff commenced employment with Cornell University as an associate professor of astronomy, earth, and atmospheric sciences and was promoted in 2025 to full professor.

14. Prof. Schmidt has continued her important work at the University developing robotic tools and instruments, including the first of its kind Icefin vehicle, to research and study the impacts of climate on Earth's ice shelves and glaciers, which she brought from her previous research programs and expanded at Cornell.

15. Prof. Schmidt was recognized in 2023 as one of Time Magazine's 100 most influential people in the world for her research on the Thwaites Glacier and the catastrophic impact climate change could have on the glacier. She was awarded American Geophysical Union's Nye lectureship in 2023 and named the Blavatnik Awards for Young Scientists National Laureate in the Physical Science and Engineering in 2024.

16. Prof. Schmidt remains a Professor at Cornell to date in the Astronomy and Earth Atmospheric Sciences departments.

## II.    Prof. Schmidt's Diagnoses with Post Traumatic Stress Disorder

17. Following a traumatic incident in 2014 during a field expedition, Prof. Schmidt was diagnosed with Post Traumatic Stress Disorder ("PTSD"), a mental health condition caused by the witnessing of or experiencing an extremely stressful or terrifying event.

3

18. Unfortunately, society has often stigmatized and dramatized the manifestation of PTSD, and those who suffer from this condition. Individuals diagnosed with PTSD are often considered "dangerous/violent" or "crazy". *See* https://pubmed.ncbi.nlm.nih.gov/23750758/.

19. Stigma and miseducation surrounding PTSD, and mental health conditions in general, have notoriously limited those suffering from such conditions from social and professional opportunities and have led to a grave misunderstanding of a person's character and temperament.

20. In reality, while PTSD is commonly associated with war veterans after experiencing combat, the condition can be caused by myriad traumatic experiences, and manifests and presents differently amongst those suffering from it.

21. In Prof. Schmidt's specific PTSD case, she experiences episodic flares of symptoms which cause Plaintiff to retreat inward and experiences dissociation and paralyzing feelings of hopelessness.

22. However, Prof. Schmidt has been able to address and cope with her condition in the field and work, and her PTSD has never presented an issue to her professionally, nor has it ever affected the health or wellbeing of any other individual.

23. Prof. Schmidt's medical condition (PTSD) substantially limits her ability to engage in one of more major life activities including but not limited to: (a) brain and neurological functioning, (b) communication and concentration; (c) interpersonal relationships and interactions; (d) physical movements; and (e) her ability to work during active PTSD episodes.

24. Based on the foregoing, Prof. Schmidt suffered, and continues to suffer, from a "disability" within the definition and meaning of the ADA.

25. Prof. Schmidt's PTSD triggers include situations of extreme stress and abandonment, threats of physical or sexual violence, as well as death or illness due to cancer.

26.    Cornell and members of Prof. Schmidt's team were made aware of her disability and Plaintiff was always open with her colleagues and expedition teams about her diagnoses and that she suffers from PTSD. She has always declared the condition on field paperwork since its diagnosis in 2015.

27.    Although Prof. Schmidt has experienced past PTSD episodes, such as one in 2017, her condition never hindered her from the ability to perform the essential functions of her job and never presented a safety risk to anyone around her.

### III.    Prof. Schmidt Meets and Begins a Friendship with John Doe

28.    In or around late 2025, while on a cruise, Prof. Schmidt met an individual named John Doe.

29.    Plaintiff and John Doe quickly sparked a close friendship which, in Plaintiff's mind, had the potential to lead to a more serious, and potentially romantic relationship.

30.    Plaintiff and John Doe spent significant time with one another while on the cruise and confided in each other as close friends. John Doe and Plaintiff offered each other moral and emotional support during difficult situations and freely spoke with one another about each other's struggles.

31.    While on the cruise, Prof. Schmidt confided in John Doe about her upcoming expedition to Greenland.

32.    The pair continued to explore a new connection and friendship while on the cruise including discussing each other's professions and work.

33.    During the cruise, it came to light that a member of Plaintiff's field team could no longer make the upcoming expedition to Greenland in the Spring of 2026, so eventually John Doe came in the team member's place.

34.     The Greenland Expedition was scheduled to run for five weeks after which John Doe' employment with Cornell would end. There was no expectation of any continued employment or relationship with Cornell for John Doe after the conclusion of the Greenland Expedition.

35.     Following the cruise, Prof. Schmidt and John Doe continued their friendship and engaged in significant text and phone call communications, including John Doe sending Plaintiff photos of himself scantily clad and/or shirtless, speaking with Plaintiff for hours including on Valentine's Day, and making arrangements to visit and stay with Plaintiff in New York and attend events with her.

36.     However, their relationship never escalated to anything physical beyond hugging, and their connection remained that of close friends.

37.     Prior to embarking on the Greenland Expedition, Plaintiff opened up to John Doe about her growing romantic feelings for him.  In response, John Doe replied positively and, while not expressing a mutual feeling of affection, essentially stating that they would see where things lead and would continue having talks about love and life in Greenland.

38.     Following this exchange, Prof. Schmidt and John Doe continued to communicate as usual.

## IV.    Prof. Schmidt Experiences a Traumatic PTSD Episode During the Greenland Expedition

39.     Prof. Schmidt and her team embarked on the Greenland Expedition in early March 2026.

40.     From the onset of the Greenland Expedition, the team experienced significant stressors in the field and on the ice which impacted progress of the mission.  The team experienced

multiple weather delays, delays due to polar bear encounters, broken equipment and insufficient support from the team based in Cornell.

41.     On March 14, Plaintiff's best friend was hospitalized and underwent a double mastectomy which triggered panic and dismay for the Plaintiff, including bouts of crying.

42.     On March 18, 2026, Plaintiff experienced a triggering event, and coupled with the mounting stress in the field, began to experience clear symptoms of a PTSD episode. Prof. Schmidt experienced feelings of shivering and tingling sensations throughout her entire body.  Initially, Prof. Schmidt did not recognize what was happening for what it was (a flare up of her condition) and attempted to work through what she felt was just a stress response to the harsh weather conditions in the field.

43.     That evening, seeking support from someone who she believed to be a close friend, Prof. Schmidt texted John Doe and invited him to cuddle if he felt comfortable doing so. John Doe admitted that when he read Prof. Schmidt's text, he merely rolled his eyes and went to sleep. The pair continued to work together as usual.

44.     On March 19th, Plaintiff picked up a new team member, a documentary filmmaker and colleague, and began to share details of the 2014 and 2015 seasons that had included triggering of her PTSD as a comparison to how field seasons could be challenging.

45.     As the evening of the 19th wore on, and through March 21, 2026, Prof. Schmidt continued to experience an ever-worsening PTSD episode. Despite her best efforts to remain composed, Prof. Schmidt eventually went into full dissociation and, for a vast amount of that time span, has no recall of the events that took place.

46.     By the morning of March 20th, Prof. Schmidt's PTSD flare up had taken control of her physically.  Plaintiff felt paralysis to even open her eyes, let alone leave her room to join the

7

team working on station that day; she vacillated between periods of numbness and uncontrolled bouts of crying. She was unable to leave her room due to severe panic and notified her whole team of the nature of her delay that morning and that she would be able and willing to share details with them later, as well as apologizing for any impact this would have on the team.

47.    Throughout the morning and afternoon, members of Prof. Schmidt's team checked in on her and her whereabouts. Plaintiff did her best to respond to the messages to let her team know what was happening, and that she would be alright but needed to rest, and gave instructions on what to do in her absence. She spent the day trying to be able to make it to the living room of their shared dormitory, eventually making plans for a meeting the next morning to plan the next day, and returned to bed in the early evening.

48.    The following morning (March 21) Prof. Schmidt was still in the midst of her PTSD episode, but the symptoms had slightly abated. Plaintiff was able to get out of bed and take a shower, though still unable to stomach much food or drink.

49.    Wanting to push forward, Prof. Schmidt forced herself to lead the team's morning meeting as usual, believing that it would be a standard meeting to discuss the plan for the day as she had instructed the team.

50.    Instead, after the day plan was made, Prof. Schmidt was bombarded with intrusive questions, comments about mental health and inquests from the team regarding her competency and ability to be out on the field.

51.    Plaintiff truthfully and confidently advised her team what had transpired, including disclosing her PTSD diagnosis and flare up, apologized to her teammates both individually and to the group meeting about how her condition had manifested affecting the team's progress over the previous day, and asked to please discuss what happened at a later time due to her severe stress

8

response and the presence of persons in the room that were not part of the project, which was inappropriate for such an inquisition.

52.    Instead of extending Prof. Schmidt any grace or understanding, her team began questioning her fitness for duty and made poorly veiled implications that it was unsafe for *them* to be around her, or for her to act as one of the bear guards while out on the ice—a position Prof. Schmidt was trained for and held for many years without incident.

53.    The pressure and interrogation Plaintiff's team subjected Prof. Schmidt to was so immense that Prof. Schmidt began to cry and choke up, trying to respond, and eventually froze on the couch for an unclear amount of time due to the inquiry having triggered her PTSD while she was still trying to recover from the first acute symptoms.

54.    Later that evening and through the next few days, Prof. Schmidt continued to meet with her team and agreed to certain concessions, although she did not believe that the concessions were necessary, to assuage the team's unfounded concerns over her PTSD condition.

55.    She also apologized in person to each of the student members and made offers to meet and discuss with them individually at any time. Prof. Schmidt was upset and remains so that by disclosing the attack—it was meant as a way to reassure the team that things would be alright—some members of the team were scared. She did her best to explain what had happened to her.

56.    For example, without any basis in fact, members of her team insisted that Prof. Schmidt relinquish her role as rifle lead and bear guard as they believed, again without justification, that Prof. Schmidt's handling of a firearm posed a safety threat. Prof. Schmidt agreed to this in order to keep the team happy and moving forward, despite being worried about placing all responsibility on a partially trained person and a new team member who was intimidated by handling rifles.

57.    Never prior to disclosure of her PTSD diagnosis had anyone on her team expressed any concern over Prof. Schmidt's handling of a firearm in the field. Nor had Prof. Schmidt ever given anyone, either before or after her PTSD disclosure, any legitimate basis to believe her handling of a firearm in the field was a cause for concern or safety risk.

58.    Still, Prof. Schmidt agreed not to continue as rifle lead in the interests of making her team feel more comfortable.

59.    Prof. Schmidt also sought an individual on the team to independently survey the team members to make sure they felt alright going into the field, all of whom agreed.

60.    Prof. Schmidt was hopeful that the concessions she made would put the team at ease, and indeed, it appeared to do that as they continued to work harmoniously together over the course of the next few days.

61.    However, this was all a farce.

## V.    Prof. Schmidt Becomes the Target of False Allegations of Misconduct Stemming from a Deep Misunderstanding of Plaintiff's Disability

62.    Rather than support Prof. Schmidt through what was clearly a traumatic experience, it appears that even if there was a temporary question about safety for some members, at least one member of the Plaintiff's team in Greenland used her episode as a means to target and lash out against Prof. Schmidt's by making unrelated accusations only after the PTSD episode.

63.    Upon information and belief, spurred by a breathtaking lack of understanding of PTSD, and fueled by stereotypical notions of the dangers of PTSD, at least one member of Prof. Schmidt's team[1] lodged inaccurate and knowingly inflammatory allegations against Plaintiff to the National Science Foundation ("NSF") via their anonymous hotline.

---

[1] Defendant has never disclosed the identities of the complaining team members to Prof. Schmidt, and moreover, details regarding the allegations against her, resulting in a lack of procedural clarity and due process.

64.     Engaging in what can only be described as revisionist history, it appears that one or more team members, upon information and belief, intentionally twisted and misrepresented past instances of Prof. Schmidt's conduct in the field to accuse Prof. Schmidt of misconduct and of being a safety risk to the team.

65.     On March 23, Plaintiff was made aware of the complaint by her NASA program manager, who had been consulting with NSF. Plaintiff took this matter very seriously; the accuracy of the complaint was immediately challenged but taken under advisement and Plaintiff asked for a meeting with NSF as well.  Plaintiff only later was notified that Cornell was made aware.

66.     At that time, Plaintiff was given permission to go into the field as planned by NASA and NSF. Without being asked, Plaintiff furnished to NASA and NSF the team members' contact information to investigate claims and made preliminary plans and suggestions for mediation and remediation actions that could be safely taken to address the team's concerns, Plaintiff's health, and preserve the ongoing work.

67.     The evening of March 23, after returning from a successful day in the field, Plaintiff returned a call from her department chair who initially expressed support from Cornell in the matter.

68.     On March 24, Plaintiff went into the field after positive interactions with Cornell, NASA, and NSF.  However, Plaintiff received a message to call Cornell, upon which Plaintiff was told she may need to leave the field to meet Cornell's requirements.

69.     Plaintiff begged to remain in the field to keep the project moving forward and avoid further trauma.  Field day was most successful of the season.

70.     Upon returning to the station, Plaintiff was informed that there would be a meeting the next morning between NASA, NSF, and Cornell and that further instructions would be furnished.

71.     Early afternoon on March 25, Plaintiff had not received any guidance from Cornell, but spoke with NASA program manager who relayed the recommendations of NASA and NSF that included 4-5 days of rest privately on station but while being allowed to be a contact for safety or provide other resources to the team as needed, that the Plaintiff refrain from acting as a bear guard or from use of any alcohol, and that Plaintiff be allowed to return to the team on Monday, March 30.  Plaintiff made arrangements for separate housing and moved to the housing following the team's comprehensive after-mission meeting that afternoon, which she ran, and which was positive.

72.     On the evening of March 25, 2026, Prof. Schmidt was notified for the first time by Cornell administrators that a complaint had been received by the NSF accusing Prof. Schmidt of misconduct and that Prof. Schmidt would have to be completely isolated from the team and not communicate with anyone about the event.

73.     Cornell representatives spoke aggressively and accusingly at Prof. Schmidt and inaccurately represented NASA and NSF guidance.

74.     Plaintiff was not provided with any support or resources despite asking and despite bringing up the discrepancy in guidance and communication she had received.

75.     Specifically, on March 26, 2026, Prof. Schmidt met with Cornell Department of Veterinary Medicine and Assistant Dean of HR, Mary Beth Jordan ("Dean Jordan")–who was introduced as Mary Beth, not as a Dean, and described as the plaintiff's "advocate" who would

12

just want the best for her--and Cornell's Dean of Engineering, Lynden Archer ("Dean Archer") virtually via Zoom.

76. At such time, Plaintiff learned that concerns regarding her conduct in the field had been raised to the Deans' attention and that an investigation commenced.

77. Prof. Schmidt was shocked to learn of the complaint and even more disheartened that it appeared her vulnerable disclosure of the PTSD episode had precipitated this attack on her.

78. Prof. Schmidt explained to Dean Jordan and Dean Archer what occurred over the course of her PTSD episode, disclosed reasons that the team would have been under acute stress and that could have colored interactions with Prof. Schmidt, details of her PTSD episode and begged to be able to speak to her team to support them and help in the final weeks of the Expedition.

79. Prof. Schmidt also disclosed that a member of the team had been under disciplinary review and that this was causing tension within the team; at the time she did not disclose the team member's name hoping that the investigation would consider this angle but not blame an individual.

80. Prof. Schmidt's requests for consideration were denied.

81. Following the meeting, Cornell preemptively took punitive action against Plaintiff without providing Prof. Schmidt any opportunity to respond to the allegations lodged against her. Rather, she was to wait until the investigation was completed.

82. Defendant directed Plaintiff to cease all supervision of her team until further notice. Defendant further prohibited Prof. Schmidt from contacting members of her team. Defendant offered daily updates, which were later refused and replaced with "check-ins" which further

stressed and upset Plaintiff who was still experiencing pronounced symptoms now exacerbated by isolation and suspicion.

83. As instructed, Plaintiff remained in Greenland but was removed from all contact with her team. Over the next few days, Prof. Schmidt reached out for help from Cornell's multiple health offices, including the University's Faculty and Staff Assistance Program ("FSAP") and International SOS ("ISOS") and was advised that the forced isolation she was required to keep was unhealthy and dangerous for her mental health.

84. Prof. Schmidt attempted to have the restrictions placed on her lifted in light of the medical advice she received but was summarily denied such relief from the University.

85. Instead, on March 28, 2026, Prof. Schmidt received a message from Dean Archer stating that Plaintiff was being placed on administrative leave pending investigation and instructing Plaintiff to immediately leave Greenland and report back to New York.

86. This was a direct re-triggering of Plaintiff's condition and left her in a significant bout of depression and despair with no support for more than a week.

87. Plaintiff was made to remain isolated with no support in Greenland. This is counter to best practices for helping individuals undergoing acute mental health emergencies or PTSD episodes. Such treatment of a person displaying acute symptoms reasonably presented a threat to her own life. Plaintiff underwent periods without being able to sleep alternating with inability to get out of bed alongside deep depression and despair, and inability to eat.

88. Plaintiff made several attempts and formal appeals of this decision including details of the risks to the team in the field, the risks to work and the misunderstanding of her condition, but ultimately, all were denied and she was forced to return to New York before the conclusion of the Expedition, which was only roughly a week away.

14

89.     Plaintiff was advised that she could and should take medical leave and was in the process of requesting leave when advised to instead take the administrative leave and was advised that she could switch to medical leave if or when needed.

90.     Following Defendant's advice and representations, Plaintiff went out on administrative leave.

91.     Following her return to New York on or about April 3, 2026, Defendant left Prof. Schmidt in limbo for nearly a month despite multiple requests for information and promised details regarding the process; Plaintiff was not presented any information regarding the allegations against her, not provided with any details regarding the investigative process being followed, and remained prohibited from engaging in any of her duties or speaking with anyone from Cornell about her position or the ongoing research of her team.

92.     The continued isolation drove significant stress and anguish for Plaintiff that results in diagnosis of generalized anxiety and severe depression.

## VI.     Cornell Entirely Ignores Prof. Schmidt's Disability and Refuses to Process her Complaint of Disability Discrimination and Retaliation

93.     On March 30, 2026, Prof. Schmidt reached out to Cornell's Office of Civil Rights ("OCR") to express her concerns regarding the handling of the pending complaint, her administrative leave, and the manner in which the situation arose, under advisement by the Cornell ombudsman.

94.     On April 6, 2026, Prof. Schmidt met with Katie King ("King") of the OCR to formally make a report that the complaints against her, the investigation, and decision to remove her from the field were the product of a misunderstanding and misinterpretation of her PTSD episode and therefore discriminatory and retaliatory.

95. In particular, Prof. Schmidt noted that all of the complaints and actions being taken against her occurred within a few short days of the disclosure of her PTSD episode on March 18-March 21, 2026, a fact that seemingly had not been considered during ongoing investigations.

96. King had been very supportive and had sought additional resources for Schmidt as a result of her disclosures to help with her PTSD.

97. Following her intake interview, Prof. Schmidt did not hear back from King again until April 20, 2026, after following up for an update.

98. At that time, King advised Prof. Schmidt that Cornell's OCR would not move forward with her complaint because the University did not believe that any discrimination or retaliation had occurred because of her own behavior, a determination made without having engaged in any investigation at all and without consideration of the effects of the condition.

99. In response, Prof. Schmidt wrote to King and stated: "While it may not seem like retaliation to you, this is definitely a case where the university is ignoring my PTSD/disability and choosing to interpret whatever has been reported as if I did not have this condition."

100. Prof. Schmidt further stated that "[f]ailing to consider or accommodate a disclosed condition, punishing someone based on that condition, or failing to act in a manner consistent with understanding the nature of the disability is a form of discrimination and taking action based on that is retaliation or at the least disparate treatment."

101. King did not respond to Prof. Schmidt's email rebuttal to the premature dismissal of her complaint. Nor did King present Prof. Schmidt with any recourse or avenue to appeal the virtually immediate dismissal of Plaintiff's legitimate report of disability discrimination and retaliation.

**VII.    Prof. Schmidt Requests, and is Denied, Reasonable Accommodation**

102.    On March 20, 2026, Prof. Schmidt submitted a formal request for reconsideration of Cornell's decision to place her on administrative leave.

103.    In Plaintiff's request, Prof. Schmidt detailed her PTSD history and the circumstances of the specific attack on March 19-20, 2026 that underscored and preceded the complaint filed against her.

104.    Prof. Schmidt specifically asked Cornell to consider her disability and engage with recommendations from NASA and medical professionals to determine an appropriate plan forward during the investigation which took her medical condition into consideration.

105.    In addition, Prof. Schmidt requested support from Cornell's International SOS for a return-to-work evaluation and emotional/psychological support from a provider experienced in PTSD.

106.    Prof. Schmidt had to find additional programs and resources since the ISOS resources did not have a suitable option and acted slowly.

107.    Prof. Schmidt did eventually acquire a meeting with the Pittufik Space Force Base psychologist who provided Prof. Schmidt with support, help managing her PTSD, and offered to support her and the team with discussions and mediation as well as constructing a safety plan in order to preserve the work and ability of Prof. Schmidt to remain in the field.

108.    Prof. Schmidt forwarded this information along as well as the psychologist's willingness to meet with the Cornell administration to help assure them.

109.    The request was also denied by the University and Prof Schmidt was forced to return to the US.

110. Eventually Prof. Schmidt saw two separate therapists upon returning to the US. In support of her requests, Prof. Schmidt attached letters from therapists confirming her PTSD diagnosis and explaining her condition and its effects.

111. Upon information and belief, none of the accommodations Plaintiff requested placed an undue burden on the University. Rather, the requested accommodations could easily have been implemented without any hardship to the University and had aligned with the suggestions of the NASA and NSF teams and the psychologist and other experts consulted.

112. Upon information and belief, even if Plaintiff's specifically requested accommodations were not feasible for the University, there existed other accommodations that could have been discovered through meaningful discussion and negotiation with Prof. Schmidt.

113. Despite the availability of reasonable accommodations for Prof. Schmidt, none were provided, nor was any empathy or support extended to Prof. Schmidt.

114. No one from the University ever granted Prof. Schmidt any accommodations.

115. Furthermore, no one from the University ever spoke to Prof. Schmidt to determine if there existed any accommodations, separate from those requested by Plaintiff, which could have been implemented through the course of the investigation.

116. Rather, Cornell ignored Plaintiff's requests for disability accommodations and proceeded with a dual disciplinary investigation against Plaintiff as if Prof. Schmidt's multiple requests for consideration of her disability and for accommodations never happened.

117. Prof. Schmidt was left isolated and without support or description of the process, conditions under which she was to independently understand what was going on, despite acute symptoms that could reasonably present a threat to her own life.

**VIII. Prof. Schmidt is Subjected to a Procedurally Deficient and Biased Dual Investigation**

118. On April 16, 2026, Plaintiff received a Notice of Formal Complaint from Cornell's Director of Civil Rights Compliance (the "Formal Complaint").

119. The Notice accused Prof. Schmidt of engaging in misconduct in violation of Cornell University Policy 6.4 (the "Policy").

120. Specifically, the Formal Complaint accused Plaintiff of engaging in misconduct toward John Doe over the course of her PTSD episode in Greenland by sending a single text to John Doe and allegedly making a single statement to John Doe which, allegedly, made John Doe uncomfortable in the workplace.

121. Within days of receiving the Formal Complaint, Prof. Schmidt was scheduled to interview with Cornell's Dean of College of Arts and Sciences, Peter John Loewen ("Dean Loewen"), regarding *his* investigation into the reports raised by Prof. Schmidt's team following her PTSD disclosure.

122. Notably, at no point prior to the scheduled meeting did Dean Loewen or anyone from Cornell provide Prof. Schmidt with additional details as to the nature of her team's complaint or even advise Plaintiff of the policies and procedures he was pursuing the investigation under.

123. Nor did Dean Loewen or anyone from Cornell speak to Prof. Schmidt regarding her requested accommodations to continue participating in either investigation, despite knowledge of Plaintiff's condition and prior requests for accommodations.

124. Moreover, Dean Loewen adamantly prohibited Plaintiff from attending the interview with her legal counsel.

125. On April 23, 2026, Dean Loewen met with Plaintiff for what ultimately ended up being an interrogation of Prof. Schmidt wherein Plaintiff was put in the proverbial 'hot seat'.

19

126. No accommodations were discussed with, let alone provided to, Plaintiff for this meeting.

127. Instead of allowing Plaintiff due process rights to know and respond to the allegations against her, Dean Loewen merely confronted Prof. Schmidt with his interpretation of the allegations and required Plaintiff to respond in real time to the limited information being presented to her via a stream of aggressive, accusatory questions.

128. The interview lasted for roughly three hours long. Over the course of the interview, Dean Loewen was aggressive and condescending, particularly to Prof. Schmidt's descriptions of her PTSD episode.

129. Prof. Schmidt was only allowed to respond to the questions asked and was not provided with materials with which to prepare.

130. Prof. Schmidt participated in the interview while still experiencing PTSD symptoms.

131. Despite the complaint being made about a small number of actions in the field, the interview then included surprise questions about other events outside the field activity and involving other people not related to the complaint.

132. During the interview, Prof. Schmidt requested a copy of the Policy she had allegedly violated, and the investigative procedures Dean Loewen was adhering to. Dean Loewen advised that he or Dean Jordan would send a copy of such procedures following the interview.

133. Following the interview, Plaintiff submitted a written response to the issues raised during the interview. Again, Plaintiff was limited in her ability to respond as she was still not permitted a copy of the specific allegations raised against her or the questions asked and therefore

had only had to rely upon her notes and memory of the hours' long interview with Dean Loewen. No notes or recordings or any resources were provided to the Plaintiff.

134. Plaintiff also requested that Dean Loewen take her disorder into consideration in the manner in which it affected her in the field on this isolated incident, and requested that Dean Loewen consult medical professionals, and speak to specifically identified witnesses in support of her response to the allegations as well as for independent perspectives outside of the persons making the initial complaint.

135. Following her initial interview, Plaintiff did not hear again from Dean Loewen regarding his investigation except when she was asked by the Dean to explain something he heard about in the field, which had nothing to do with the Greenland Expedition and, in fact, predated Prof. Schmidt's employment with Cornell by nearly a decade.

136. Although doing so was incredibly painful and required Prof. Schmidt to disclose personal traumatic experiences wholly unrelated to the Greenland Expedition, Plaintiff duly responded to Dean Loewen's inquiry providing details of the original diagnosis of Prof. Schmidt's PTSD that had occurred due to a verbal and physical interaction in the field with unknown males.

137. Thereafter, Prof. Schmidt did not hear back from Dean Loewen regarding his investigation for over a month, despite repeated requests for updates and/or details given deadlines and other professional requirements approaching.

138. On April 30, 2026, Prof. Schmidt, accompanied by her legal counsel, met with Christie White, a Title IX Investigator from Cornell's OCR ("Investigator White"). At that time, Prof. Schmidt was asked to specifically respond to the allegations listed in the Formal Complaint and was provided an opportunity to submit evidence for Investigator White's consideration.

21

139. Once again, no accommodations were discussed with, offered, or provided to Prof. Schmidt during this meeting.

140. During the interview, Prof. Schmidt again described her PTSD episode and truthfully answered Investigator White's questions, including the fact that her state of dissociation prevented her from having any recall of certain events listed in the Formal Complaint.

141. Following her interview with Investigator White, Prof. Schmidt submitted additional evidence, which had been requested of her, in the format requested.

142. Throughout both investigations, Prof. Schmidt remained fully transparent and honest about what occurred in the field and answered to the best of her ability, given the limited information she was permitted.

## IX.    During the Investigation, Cornell Attempts to Interfere with Plaintiff's NASA Grants

143. At the time of the beginning of the investigations and Prof. Schmidt's administrative leave, Prof. Schmidt was the principal investigator ("PI") for several grants from NASA.

144. While Prof. Schmidt was on administrative leave, Cornell made several attempts to improperly shift the PI title from Prof. Schmidt to another team member, Peter Washam ("Washam").

145. Washam had never been placed in charge of these grants previously and had little experience as PI. Prof. Schmidt was not told of these actions prior to their initiation.

146. Upon information and belief, Cornell should have, but did not, clear the change in PI with NASA and instead, attempted to strong arm Prof. Schmidt into agreeing to give up the PI title and authority to an underqualified and inexperienced colleague who was also under pressure from Cornell as his employer to follow their processes and directions or face sanctions.

22

147. In addition, Cornell repeatedly and intentionally gave Prof. Schmidt misinformation regarding her status as PI and the status of her grants during her administrative leave and misrepresented NASA regulations to her and other investigators.

148. The University outright told Plaintiff that she should not discuss what was happening in relation to her grants and research with NASA, who has a direct financial interest in Prof. Schmidt's work, and advised Plaintiff to use Cornell as the liaison for all communications with NASA.

149. As it would turn out, Cornell's direction not only violated NASA protocols, but the University's representations regarding the status of Plaintiff's grants and what "must" happen to them during her leave.

150. Cornell's representations that the grants needed to be reassigned were entirely false as confirmed by NASA personnel and survey of NASA and federal government grant regulations.

151. Upon information and belief, Cornell's only interest was in siphoning away Prof. Schmidt's grants to the benefit of the institution and to the control of complaining team members even if doing so would have jeopardized not only the availability of the funds but also violated NASA's rules and procedures.

## X. Cornell Finds Prof. Schmidt Responsible and Issues Unduly Punitive Sanctions and Restrictions Upon her Continued Employment

152. On May 19, 2026, Prof. Schmidt received a copy of Investigator White's Final Investigative Report (the "FIR") regarding the Policy 6.4 violation Plaintiff had been charged with.

153. The FIR was riddled with inconsistencies and contradicting assessments of Prof. Schmidt's and John Doe' respective credibility.

154. By example, but not limitation, the FIR found John Doe had changed his story and misrepresented his relationship with Prof. Schmidt and therefore was not credible.

155. Most notably, the FIR failed to make any significant mention of Prof. Schmidt's PTSD disclosure and treated her traumatic episode in Greenland as nothing more than a byline rather than a mitigating factor to be considered in the investigation.

156. Nor did the FIR make any mention of Plaintiff's denied request for accommodation.

157. The FIR mentioned that this was the first complaint against Plaintiff and that the Plaintiff had provided materials despite that these might have been injurious against her.

158. Rather, the FIR shockingly found that, despite any credible or corroborating evidence, Prof. Schmidt had violated Policy 6.4 and should be sanctioned accordingly. The recommended sanction was only a conversation.

159. On June 2, 2026, Prof. Schmidt's doctor submitted the paperwork to Cornell in support of a medical leave for Plaintiff. Prof. Schmidt followed up on June 3 and was told that she had to email the paperwork to Defendant, which she did immediately.

160. Based on Defendant's guidance, Prof. Schmidt believed submission of her paperwork via email commenced her medical leave.

161. On June 3, 2026, Prof. Schmidt submitted a response to the FIR which was, in theory, meant to be considered by Dean Loewen when making a final determination of the investigations' outcomes.

162. In her response, Plaintiff outlined the many contradictions in the FIR which improperly manipulated the record to support the determination of responsibility, called out the investigator's lack of consideration of Plaintiff's disability, and detailed the ways in which the evidence from the investigation did not meet the standards outlined in Defendant's applicable policy.

163. On June 8, 2026, Prof. Schmidt met with Dean Loewen via Zoom.

164. During the meeting, Dean Loewen notified Prof. Schmidt that she had been found responsible for all allegations made against her and described the sanctions which would be immediately put into place as a result of his findings and determination.

165. He did so in a condescending, aggressive, and dismissive manner with complete lack of empathy. He included threats of firing and claimed that the whole administration believed she should be seriously sanctioned for the as-yet undisclosed accusations.

166. The Dean stated that the real reason she was being punished was for not accepting responsibility, despite no written or clearly communicated accusations ever being provided. Rather, it appears that Prof. Schmidt was punished for defending herself, which she did with evidence.

167. During the meeting, Prof. Schmidt noted her disagreement with the determination and questioned the basis for the findings. Prof. Schmidt reiterated that she had been experiencing a PTSD episode and that the allegations as she had been allowed to know them were patently false and the decision was in conflict with the written report.

168. In response to Prof. Schmidt's remarks, Dean Loewen condescendingly chastised her for trying to defend herself, accused her of making excuses and hurting herself by not just taking responsibility for the false accusations, and adamantly refused to provide **any** details regarding the investigation, the evidence in support of his determination, or any information related to the basis for the sanctions.

169. The Dean would not confirm whether any of the individuals Prof. Schmidt asked to be consulted who were present in the field or had knowledge of relevant circumstances had been consulted; these individuals confirm they were never contacted.

170. Dean Loewen then ended the meeting with a remark that he would not speak with Prof. Schmidt any further.

171. Shortly thereafter, Dean Loewen sent Prof. Schmidt, via email, the official written notice of the investigations' determinations and the sanctions to be imposed (the "Determination Letter").

172. The sanctions include, among other things:

a. A disciplinary suspension from June 15, 2026 through November 15, 2026, with the time period July 1, 2026 through November 15, 2026 to be unpaid;

b. Prohibition from campus, from performing any of Complainant's Cornell duties, prohibition from representing to anyone that she is performing *any* Cornell duties during the period of the suspension, prohibition on communication with any Cornell staff or students, and prohibition to access to any administrative staff, or research funds held at Cornell;

c. Upon Complainant's return to from leave through the duration of her employment with Cornell, prohibition from consuming any alcohol on campus or in connection with any Cornell event or activity;

d. Prohibition from independently hiring, firing, or supervising any staff until December 31, 2027; and

e. Requirement to have co-advisors for all graduate advisees until December 31, 2027.

173. In addition, the Determination Letter included the imposition of an emergency suspension from June 8th until the June 15th disciplinary suspension began.

174. The emergency suspension imposed the same punitive restrictions on Plaintiff's employment as the disciplinary suspension without just basis.

175. In the Determination Letter, Dean Loewen wrote, seemingly with disdain, in reference to Prof. Schmidt's disability and explanation of her dissociating.

176.    Specifically, the Determination Letter accused Prof. Schmidt of trying to excuse her behavior by claiming she was in a dissociative state but that she should just have just taken accountability.

177.    At no point has Prof. Schmidt tried to hide behind her disability; at all times throughout this process, Prof. Schmidt has only tried to be transparent and honest about her condition, the manner in which it manifested in the field, and sought a modicum of grace and understanding as the University investigated the allegations lodged against her as a result of the manifestations of her PTSD in the field.

178.    In essence, Cornell punished Prof. Schmidt for daring to have a PTSD episode while employed by the University.

179.    On June 9, Prof. Schmidt was officially denied medical leave because she was "suspended" at the time "to address serious conduct concerns in Greenland." However, this justification was demonstrably false.

180.    At the time of Plaintiff's application for medical leave, she was on—at Cornell's insistence—an administrative leave and was still conducting Cornell duties.

181.    Prof. Schmidt was provided with an opportunity to appeal the Determination and did so to various offices and departments within the University.

182.    Prof. Schmidt's various appeals remain pending. However, during the appeals' pendency, the emergency suspension provisions remain in effect.

183.    Prof. Schmidt has appealed the emergency suspension and that appeal remains pending despite this violating Cornell's policies and being unnecessarily and intentionally punitive.

184.    In the meantime, Prof. Schmidt has been left in shambles.

185. As a result of the University's outright refusal to consider, recognize, and/or accommodate Prof. Schmidt's known disability, Plaintiff has suffered damage to her professional and personal reputation, setback to her continued research, and is now facing a five-month disciplinary leave which will have immeasurably negative effects on her personally, professionally, and financially.

186. These refusals will also distress and negatively impact Plaintiff's many students and staff, who have been very close and most of whom likely are uninvolved and potentially disagree with the accusations made against Plaintiff.

## CAUSES OF ACTION
### AS AND FOR A FIRST CAUSE OF ACTION
*(Violation of the Rehabilitation Act – Disability Discrimination)*

187. Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

188. At all times relevant, Plaintiff was a "qualified individual with a disability."

189. At all times relevant, Cornell received, and continues to receive, federal financial assistance and funding as contemplated by the Rehabilitation Act in the form of, among other things, receipt of Federal Pell Grants.

190. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations at 34 C.F.R. Part 104, prohibit discrimination against qualified individuals with disabilities in federally funded programs and activities, including employment. Specifically, 34 C.F.R. § 104.12 prohibits recipients of federal financial assistance from discriminating against qualified individuals with disabilities in recruitment, hiring, compensation, job assignments, promotions, layoffs, terminations, leaves, benefits, and all other employment-related activities.

28

191.    Section 504 of the Rehabilitation Act requires entities, such as Cornell University, to provide programs and services in an integrated setting and to make reasonable modifications in policies, practices, and procedures that allow equal access to individuals with disabilities.

192.    As set forth herein and above, Cornell violated these provisions by subjecting Prof. Schmidt to adverse employment actions because of her disability and the manifestations of her disability.

193.    As set forth herein and above, Plaintiff was subjected to hostile and unfair treatment due to her disability, by, among other things, (a) forcing medically contraindicated isolation that exacerbated her PTSD; (b) conducting aggressive, accusatory interrogations without disability accommodations while she was experiencing acute PTSD symptoms; (c) removing her from the field immediately after her disability disclosure despite recommendations from NASA, NSF, and medical professionals that she could safely continue with appropriate support; (d) conducting a biased investigation that treated her disability-related dissociation as an 'excuse' rather than a symptom; and (e) imposing a five-month unpaid suspension and career-ending restrictions based on conduct that was directly caused by her disability.

194.    Cornell's actions were subjectively and objectively severe and pervasive, altering the terms and conditions of Prof. Schmidt's employment.

195.    As set forth herein and above, the discrimination and failure to accommodate Plaintiff has had a severe negative effect on Plaintiff's workplace environment.

196.    As a result of Cornell's actions and inaction, Plaintiff has suffered significant damages, including but not limited to, emotional distress and severe mental anguish, reputational harm, and loss of professional opportunities and financial losses, including, but not limited to, income and grants.

197.    Based on the foregoing, Cornell discriminated against Plaintiff in violation of Section 504 of the Rehabilitation Act.

**AS AND FOR A SECOND CAUSE OF ACTION**
*(Violation of the New York State Human Rights Law – Disability Discrimination)*

198.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

199.    At all times relevant, Plaintiff was a "qualified individual with a disability."

200.    The New York State Human Rights Law requires entities, such as Cornell, to provide programs and services in an integrated setting and to make reasonable modifications in policies, practices, and procedures that allow equal access to individuals with disabilities.

201.    As set forth herein and above, Cornell violated these provisions by subjecting Prof. Schmidt to adverse employment actions because of her disability and the manifestations of her disability.

202.    As set forth herein and above, Plaintiff was subjected to hostile and unfair treatment due to her disability, by, among other things, (a) forcing medically contraindicated isolation that exacerbated her PTSD; (b) conducting aggressive, accusatory interrogations without disability accommodations while she was experiencing acute PTSD symptoms; (c) removing her from the field immediately after her disability disclosure despite recommendations from NASA, NSF, and medical professionals that she could safely continue with appropriate support; (d) conducting a biased investigation that treated her disability-related dissociation as an 'excuse' rather than a symptom; and (e) imposing a five-month unpaid suspension and career-ending restrictions based on conduct that was directly caused by her disability.

203.    Cornell's actions were subjectively and objectively severe and pervasive, altering the terms and conditions of Prof. Schmidt's employment.

204.    As set forth herein and above, the hostility and discrimination Plaintiff was subjected to has a severe negative effect on Plaintiff's workplace environment.

205.    As a result of Cornell's actions and inaction, Plaintiff has suffered significant damages, including but not limited to, emotional distress and severe mental anguish, reputational harm, and loss of professional opportunities and financial losses, including, but not limited to, income and grants.

206.    Based on the foregoing, Cornell discriminated against Plaintiff in violation of the New York State Human Rights Law.

### AS AND FOR A THIRD CAUSE OF ACTION
*(Violation of the Rehabilitation Act – Failure to Accommodate)*

207.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

208.    At all times relevant, Plaintiff was a "qualified individual with a disability."

209.    Section 504 of the Rehabilitation Act requires entities, such as Cornell, to provide programs and services in an integrated setting and to make reasonable modifications in policies, practices, and procedures that allow equal access to individuals with disabilities.

210.    As set forth herein and above, Plaintiff was a qualified individual with a disability and Cornell had knowledge and/or was on notice of Plaintiff's disability and disability related symptoms.

211.    As set forth herein and above, Plaintiff requested disability accommodations while working for Cornell, specifically during the pendency of the misconduct investigations initiated against her.

212.    As set forth herein and above, Cornell failed to sufficiently accommodate Plaintiff's disability in the workplace environment, repeatedly disregarded Plaintiff's request for disability accommodations during the investigative proceedings, failed to provide adequate accommodations to Plaintiff to allow her an equal opportunity to defend herself during the investigative proceedings, and continue to fail to accommodate Plaintiff's disability opting instead to force Plaintiff to participate in a proceeding that Cornell knows Plaintiff cannot fairly engage in to defend herself.

213.    As set forth herein and above, Cornell failed to engage in any interactive process with Prof. Schmidt to identify reasonable accommodations.

214.    Despite multiple requests for accommodations beginning March 20, 2026, and continuing through the investigation, no Cornell administrator ever: (a) met with Plaintiff to discuss what accommodations would enable her to participate equally in the investigations; (b) consulted with Plaintiff's medical providers about appropriate accommodations; (c) considered the accommodations recommended by NASA, NSF, and the Pittufik Space Force Base psychologist; (d) proposed alternative accommodations; or (e) explained why any requested accommodation would constitute an undue burden.

215.    As set forth herein and above, Cornell's failure to accommodate Plaintiff's disability had a significantly severe effect on Plaintiff's workplace environment and resulted in Plaintiff's total inability to adequately and fairly participate in the investigative proceedings.

216.    As a result of Cornell's actions and inaction, Plaintiff has suffered significant damages, including but not limited to, emotional distress and severe mental anguish, reputational harm, and loss of professional opportunities and financial losses, including, but not limited to, income and grants.

217.    Based on the foregoing, Cornell discriminated against Plaintiff and failed to accommodate Plaintiff's disability in violation of Section 504 of the Rehabilitation Act.

### AS AND FOR A FOURTH CAUSE OF ACTION
*(Violation of the New York State Human Rights Act – Failure to Accommodate)*

218.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

219.    At all times relevant, Plaintiff was a "qualified individual with a disability."

220.    The New York State Human Rights Law requires entities, such as Cornell, to provide programs and services in an integrated setting and to make reasonable modifications in policies, practices, and procedures that allow equal access to individuals with disabilities.

221.    As set forth herein and above, Plaintiff was a qualified individual with a disability and Cornell had knowledge and/or was on notice of Plaintiff's disability and disability related symptoms.

222.    As set forth herein and above, Plaintiff requested disability accommodations while working for Cornell, specifically during the pendency of the misconduct investigations initiated against her.

223.    As set forth herein and above, Cornell failed to sufficiently accommodate Plaintiff's disability in the workplace environment, repeatedly disregarded Plaintiff's request for disability accommodations during the investigative proceedings, failed to provide adequate accommodations to Plaintiff to allow her an equal opportunity to defend herself during the investigative proceedings, and continue to fail to accommodate Plaintiff's disability opting instead to force Plaintiff to participate in a proceeding that Cornell knows Plaintiff cannot fairly engage in to defend herself.

224.    As set forth herein and above, Cornell failed to engage in any interactive process with Prof. Schmidt to identify reasonable accommodations.

33

225.    Despite multiple requests for accommodations beginning March 20, 2026, and continuing through the investigation, no Cornell administrator ever: (a) met with Plaintiff to discuss what accommodations would enable her to participate equally in the investigations; (b) consulted with Plaintiff's medical providers about appropriate accommodations; (c) considered the accommodations recommended by NASA, NSF, and the Pittufik Space Force Base psychologist; (d) proposed alternative accommodations; or (e) explained why any requested accommodation would constitute an undue burden.

226.    As set forth herein and above, Cornell's failure to accommodate Plaintiff's disability had a significantly severe effect on Plaintiff's workplace environment and resulted in Plaintiff's total inability to adequately and fairly participate in the investigative proceedings.

227.    As set forth herein and above, the hostility and discrimination Plaintiff was subjected to has a severe negative effect on Plaintiff's workplace environment.

228.    As a result of Cornell's actions and inaction, Plaintiff has suffered significant damages, including but not limited to, emotional distress and severe mental anguish, reputational harm, and loss of professional opportunities and financial losses, including, but not limited to, income and grants.

229.    Based on the foregoing, Cornell discriminated against Plaintiff on the basis of her disability and failed to accommodate Plaintiff's disability in violation of the New York State Human Rights Law.

### AS AND FOR A FIFTH CAUSE OF ACTION
*(Breach of Contract)*

230.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

231.    Under New York law, to establish a breach of contract, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the [claimant], (3) breach of contract by the [accused], and (4) damages." *Stadt v. Fox News Network LLC,* 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010).

232.    Under New York law, policies in a personnel manual specifying the employer's practices with respect to the employment relationship become a part of the employment contract. *See Langenkamp v. Olson,* 628 F. App'x 50, 52 (2d Cir. 2015); *Kaloyeros v. Rsch. Found. of State Univ. of New York*, 71 Misc. 3d 1219(A), 144 N.Y.S.3d 557 (N.Y. Sup. Ct. 2021) (same).

233.    Defendants breached Prof. Schmidt's employment contract by subjecting her employment to discipline in violation of the terms of the specific procedures set forth in Cornell's various employment policies.

234.    Specifically, Cornell's Bylaws and Faculty Handbook (the "Handbook") contain specific procedures and policies related to the dismissal or suspension of staff and faculty.

235.    The Bylaws and Handbook provide, in relevant part:

> When [a] complaint from any course is made against a university professor … which might lead to his or her dismissal or to suspension for the period of one or semester or more, the dean of his or her college … shall inform the faculty member of the complaint against him or her, investigate the case, and if the faculty member is willing, consult with him or her regarding it. The dean shall thereafter report to the provost the results of the investigation together with his or her recommendations. The provost shall cause the faculty member to be furnished with a written and detailed statement of the charges against him or her and the suggested disciplinary action if, after receiving the dean's report and making such independent investigation as may seem appropriate to the provost, it is the opinion of the provost that further proceedings are warranted.

236.    As set forth herein and above, at all relevant time Prof. Schmidt was and is a professor at Cornell University.

237. Beginning in March 2026, the dean of Prof. Schmidt's specific college at Cornell instituted an investigation against Plaintiff based on allegations of misconduct against Plaintiff.

238. Upon information and belief, at all times relevant, Dean Loewen knew that the investigation may lead to the dismissal or prolonged suspension of Plaintiff's employment.

239. Indeed, Dean Loewen admitted in discussions with Plaintiff that termination of her employment was considered as a sanction and ultimately issued a disciplinary sanction of a prolonged five-month suspension spanning the Summer and Fall semesters.

240. At no point during the investigation, at sanctioning, or thereafter did the provost or anyone acting on Cornell's behalf provide Prof. Schmidt with a "written and detailed statement of the charges against her" as required by the Bylaws and Handbook.

241. Nor did the provost or anyone acting on Cornell's behalf provide Plaintiff was written notice of the "*suggested* disciplinary action" (emphasis added) to be issued to her.

242. Rather, Prof. Schmidt was notified of already determined and confirmed disciplinary action to be taken against her as determined by Dean Loewen.

243. Cornell's Bylaws and Handbook also provide for the right to a hearing for any faculty member facing a conduct investigation.

244. Specifically, the policies provide, in relevant part:

> If the faculty member desires a hearing, he or she shall so request in writing to the provost within thirty days of the receipt of the written charges against him or her, and he or she shall then be entitled to a hearing before a board appointed by the provost and consisting of five members of the University Faculty, of whom two shall be selected by the faculty member, two by the provost and the fifth by the other four.
>
> At such hearing the faculty member shall be entitled to be accompanied by an advisor or counsel of his or her own choice, to present witnesses in his or her own behalf and to confront and question the witnesses against him or her.

245.    As set forth above, at no point did the provost or anyone acting on Cornell's behalf provide Prof. Schmidt with a "written and detailed statement of the charges against her" as required by the Bylaws and Handbook.

246.    Therefore, Plaintiff was not provided the opportunity to request a hearing as she was entitled to under the Bylaws and Handbook.

247.    Moreover, at no point anyone acting on Cornell's behalf notify Plaintiff of her right to a hearing or otherwise advise her of the specific policy or procedures to be followed during the investigation.

248.    As a result of Defendant's actions, Plaintiff was deprived of her contractual rights in the investigations and forced to participate in the dean's investigation without any semblance of due process.

249.    The Bylaws and Handbook further provide the requisite parameters regarding the imposition of emergency suspensions.

250.    Specifically, the policies provide, in relevant part:

> "Emergency suspension" refers to the suspension by the president or his designee with full salary pending the ultimate determination of the faculty member's case where the faculty member is charged with misconduct and his or her continuance threatens imminent, serious harm to the member, to others, or to property. The scope and duration of the emergency suspension shall be tailored as narrowly as possible to the nature of the harm posed, so that the faculty member's rights and privileges are not summarily abrogated more broadly than in reasonably necessary to protect persons or property pending completion of the suspension procedures.

251.    As set forth herein and above, Dean Loewen placed Plaintiff on an emergency suspension beginning June 8, 2026 and continuing to date.

252. The emergency suspension renders Plaintiff all but terminated except for the continued payment of Plaintiff's salary, and has no defined end date as it remains in effect pending the outcome of Prof. Schmidt's pending appeals.

253. In violation of the Bylaws and Handbook, the emergency suspension has not been tailored *at all*, let alone as narrowly as possible, and bears no relation to the allegations Plaintiff is accused of committing.

254. Rather, the emergency suspension has been implemented to act as a harsh interim punishment while Plaintiff exhausts her rights to appeal the erroneous and unsupported findings against her.

255. Based on the foregoing, Defendant has breached its contractual obligations to Plaintiff and is liable to Plaintiff for damages to be determined at trial.

## REQUEST FOR INJUNCTIVE RELIEF

256. Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

257. As set forth herein and above, Cornell failed to sufficiently accommodate Plaintiff's disability in the workplace environment, repeatedly disregarded Plaintiff's request for disability accommodations during the investigative proceedings, failed to provide adequate accommodations to Plaintiff to allow her an equal opportunity to defend herself during the investigative proceedings, and continues to fail to accommodate Plaintiff's disability opting instead to force Plaintiff to participate in a proceeding Cornell knows Plaintiff cannot fairly engage in to defend herself.

258. Accordingly, Defendant continues to knowingly violate Plaintiff's rights and ability to adequately participate and defend herself during the investigative processes, leading to a

foregone conclusion that Plaintiff's appeal will be unfairly dismissed, resulting in significant consequences.

259. In addition, Plaintiff remains forced on an unjustified emergency suspension without the benefit of any due process prior to its implementation and in violation of Cornell's own policies.

260. Defendant's actions have caused and shall continue to cause Plaintiff irreparable harm.

261. At the time of Plaintiff's immediate suspension, she had already experienced the PTSD attack within a brief period, and it had subsided. She was nevertheless ordered to leave Greenland and report back to New York, forfeiting any benefit her presence would have offered the Expedition.

262. She has been advised by medical professionals that continued isolation and prohibition from duties with Cornell would be harmful and will only exacerbate her diagnosis of PTSD.

263. Plaintiff has already experienced exacerbation of her PTSD diagnosis as it has morphed into generalized anxiety and depression and prolonged PTSD episodes.

264. Indeed, Plaintiff has been advised by her treating provider that if the isolation continues, side effects will include cognitive decline, memory loss, and shocks to her nervous system.

265. Even with knowledge of the medical advice given to Plaintiff, Cornell continues to isolate Plaintiff from her duties without basis.

266. In addition to the damage being wrought on her personal and medical well-being, Plaintiff's reputation continues to suffer.

267. Prof. Schmidt has an international reputation that has been harmed by untrue and unproven allegations that she is somehow not fit for her duties. Organizations and individuals within Cornell have been forced not to engage with her due to the investigation and suspension, but the damage has now extended not just to individuals within Cornell, but other institutions.

268. The reputational harm she is experiencing professionally and personally is putting her future career in imminent danger, having already been removed from leadership in her program, removed as the director of an international school since being given a suspension that does not allow her to complete any duties, and prevented from participating in required functions of her funded awards and professional agreements.

269. The emergency suspension is five months in addition to the three months she has already been suspended, plus the length of the appeal process, which is essentially constructive discharge because it takes a year at minimum to find a new job in the world of academia.

270. Prof. Schmidt will not only have to find new employment, which as stated, takes a year at minimum, but she is also *the authority* in her field and there are even fewer suitable positions for her as institutions also must possess a program specific to her expertise and means to support such a program.

271. Prof. Schmidt is a trusted steward, and agencies and donors give money due to her unique expertise, reputation, and experience. She is concerned that the grants and funding she was entrusted with will be wasted and misspent if she is not able to control the allocation of the funds, and that her team, research, and projects will be harmed.

272. If the money is wasted and misspent, there is no way to gauge the damage it will have on future ability to acquire grants, any donors' generosity, nor the impact it will have on the future of her field of study and donations to other institutions. Without proper management the

federal funding agencies can remove the grants entirely from the program, damaging the careers of Prof. Schmidt and her team irreparably.

273. Plaintiff will experience a loss of a proposal that will impact the next two or three years that if properly submitted would result in three years of funding and pay for a field campaign in Antarctica, but she has not been permitted to finish and submit the proposal and therefore, the state of the funding is unknown. It is crucial and time sensitive that the field campaign happens next year because if they wait any longer, the ice shelf may not be there— it is literally melting.

274. These punitive actions will destroy her work with the United Kingdom, including a 4 month field campaign in 2027 which is a once in a lifetime opportunity.

275. Prof. Schmidt will experience deterioration of her relationships with those who provide logistics for expeditions, who unfairly believe, through no fault of their own, that if Prof. Schmidt is put on emergency suspension, she must be unsafe in some way.

276. Prof. Schmidt will no longer be allowed to participate in the The Josep Comas i Solà International Summer School in Astrobiology co-directed by the NASA Astrobiology Program and the Centro de Astrobiología (CAB). It is a week-long program for graduate students and postdoctoral that includes lectures from international experts, round-table discussions, student projects and presentations, a whole-day field excursion to a nearby site of astrobiological interest, and cultural activities provided by the hosting university held annually at the Palacio de la Magdalena in Santander, Spain. Well-established for the astrobiology community, this program forges new relationships and helps build international collaboration in astrobiology bringing 20 students from Europe, 20 from the United States, and Prof. Schmidt has described the program as "life changing." She has spent a lot of time on this all year, as she is U.S. Director, including working with the international team to organize the school and helping select a rarely assembled

group of experts for this week.  Because she could not move her grant money, she is being told she may not work on it, nor attend.

277.    Not only is her absence heartbreaking, but a large group of people from around the world will be left wondering what could have happened that led to her absence, further breeding the unfair suspicion and judgment she has already been experiencing.

278.    Prof. Schmidt's students are also being unfairly harmed because of the sanctions. She is no longer allowed to be on a Student's Defense in the third week in June, and she is no longer allowed to continue mentoring students she has mentored for their entire careers at Cornell.

279.    She has also been restricted from working with students at Georgia Tech because of these sanctions, a university having nothing to do with Cornell.

280.    Losing the ability to mentor students has exacerbated Plaintiff's symptoms of PTSD, depression, and generalized anxiety. She has been working with one of her students for seven years, and she is distraught over the hurt that this is causing her students as well as herself.

281.    Additional proposals are due in August that would fund her post-doctoral and graduate students, but due to these unfair, premature, and overly punitive sanctions, the proposals will not be submitted.

282.    No plain, adequate, or complete remedy at law is available to the Plaintiff to redress the wrongs addressed herein.

283.    Accordingly, Plaintiff is entitled to injunctive relief that restrains Cornell from (i) continuing the emergency suspension against Plaintiff, (ii) continuing to pursue the investigative process without ensuring Plaintiff's ability to sufficiently participate with any necessary reasonable accommodations, and (iii) a review of the investigation with consideration of Plaintiff's disability.

284. Failure to grant the requested injunctive relief will cause irreparable harm to Plaintiff. The decision to continue through the investigative process and hearing has had an immediate and detrimental impact on Plaintiff and has implications for all current and incoming disabled students to Cornell University.

285. There is no adequate remedy at law for this harm.

286. The continuing, irreparable harm caused by Cornell's discriminatory actions far outweighs any possible harm that granting the injunctive relief might cause Cornell.

287. Preliminarily enjoining Cornell from holding the hearing until such time as adequate accommodations are provided to Plaintiff so that she may sufficiently and equally participate in the investigations and defend herself against the allegations against her ensures retention of the status quo during the course of this litigation.

288. Cornell will suffer no harm by, in essence, allowing Plaintiff her statutory rights to adequate disability accommodations and permitting Plaintiff to participate fully in the proceedings.

289. The only effect on Cornell will be the possible delay to the already prolonged proceedings and/or the requirement to reinvestigate the allegation in a manner consistent with Plaintiff's procedural and statutory rights to due process, fairness, and equity.

290. The injunctive relief that Plaintiff requests will promote the public interest in that it will maintain career opportunities for Plaintiff and other disabled students and employees, will end discriminatory action by Cornell and will promote compliance with federal and state law.

## **JURY DEMAND**

291. Plaintiff hereby demands a trial by jury on all issues and claims.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court:

(i)     Enter an order declaring that Cornell University has discriminated against Plaintiff by failing to accommodate Plaintiff's known disabilities and enforcing its investigative procedures against Plaintiff without consideration of her disability status in violation of the Rehabilitation Act, the NYSHRL, and the regulations promulgated thereunder;

(ii)    Issue a temporary restraining order to prevent Cornell from proceeding with the suspension and sanctions until a hearing for a preliminary injunction can be held;

(iii)   Issue a temporary restraining order to prevent Cornell from obtaining control over funds and grants without Plaintiff's participation and consent;

(iv)    Award Plaintiff compensatory damages and other monetary relief as permitted by law, including punitive damages and damages for emotional distress;

(v)     Award Plaintiff her reasonable attorneys' fees and expenses;

(vi)    Award Plaintiff statutory pre- and post-judgment interest on all sums awarded, where available; and

(vii)   Order such other and further relief the Court finds just and proper.


**Dated:   New York, New York**
**June 26, 2026**

                                          Respectfully submitted,

                                          **NESENOFF & MILTENBERG, LLP**

                                          **By:   _s/ Andrew T. Miltenberg_**
                                                  Andrew T. Miltenberg, Esq.
                                                  Gabrielle M.  Vinci, Esq.
                                                  363 Seventh Avenue, Fifth Floor
                                                  New York, New York 10001
                                                  (212) 736-4500
                                                  amiltenberg@nmllplaw.com
                                                  gvinci@nmllplaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BRITNEY SCHMIDT, | ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CORNELL UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**BRITNEY SCHMIDT,** being duly sworn, deposes and says:

1. My name is Britney Schmidt and I am the Plaintiff in the above referenced matter. I base this declaration upon knowledge with respect to myself, and upon knowledge, information and belief as to all other matters.

2. I have read the annexed Verified Amended Complaint, know the contents thereof, and the same are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true

I, Britney Schmidt, declare that the foregoing statements made by me are true and accurate to the best of my personal knowledge and belief. I am aware that if any of the foregoing statement made by me are willfully false, I am subject to punishment, including potential perjury.

Britney Schmidt

Dated: June 26, 2026

1